UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARREN DWIGHT HAGGERTY, | No. 1:21-cv-01004-JLT-GSA |
| Plaintiff, | |
| v. | **FINDINGS AND RECOMMENDATIONS TO DIRECT ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANT COMMISSIONER OF SOCIAL SECURITY** |
| KILOLO KIJAKAZI, acting Commissioner of Social Security, | |
| Defendant. | **(Doc. 20, 24)** |
| | **OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN (14) DAYS** |

## I.    Introduction

Plaintiff Darren Dwight Haggerty ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for supplemental security income pursuant to Title XVI of the Social Security Act.  The matter is before the undersigned for issuance of Findings and Recommendations based on the parties' briefs.[1]  Docs. 20, 24.  After reviewing the record the undersigned finds that substantial evidence and applicable law do not support the ALJ's decision.

## II.    Factual and Procedural Background[2]

On June 5, 2018 Plaintiff applied for supplemental security income.  The Commissioner denied the application initially on October 10, 2018 and on reconsideration on November 16, 2018.  AR 127–39, 141–56.  A hearing was held before an Administrative Law Judge (the "ALJ") on March 19, 2020.  AR 46–76.  On April 8, 2020 the ALJ issued an unfavorable decision.  AR 16–45.  The Appeals Council denied review on October 8, 2020.  AR 6–12.

---

[1] The parties did not consent to jurisdiction the Magistrate Judge.  *See* Docs 8, 11.  Accordingly, the matter was then assigned to "Unassigned DJ" and reassigned to District Judge Jennifer Thurston upon her appointment.  Doc. 7, 16.

[2] The undersigned has reviewed the relevant portions of the administrative record including the medical, opinion and testimonial evidence about which the parties are well informed, which will not be exhaustively summarized.  Relevant portions will be referenced in the course of the analysis below when relevant to the parties' arguments.

### III. The Disability Standard

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).

When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and quotations omitted). If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the

claimant is or is not disabled.  20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level.  20 C.F.R. § 416.920(a)-(f).  While the Plaintiff bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to prove that Plaintiff can perform other work in the national economy given her RFC, age, education and work experience.  *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

## IV.    The ALJ's Decision

At step one the ALJ found that Plaintiff had not engaged in substantial gainful activity since his application date of June 5, 2018.  AR 22.  At step two the ALJ found that Plaintiff had the following severe impairments: congestive heart failure, hypertensive vascular disease, asthma, obesity, and history of pulmonary embolism.  AR 22.  The ALJ also found the following non-severe impairments: history of substance abuse and depression.  AR 22.  At step three the ALJ found that Plaintiff did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 25–26.

Prior to step four the ALJ evaluated Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. 416.967(b) with the following additional restrictions: occasional climbing; occasional postural activities; no work on ladders ropes or scaffolds; no work around unprotected heights or fast moving machinery; less than occasional exposure to temperature extremes, humidity, fumes, odors, and dust; simple, routine, and repetitive tasks.  AR 26–38.

At step four the ALJ concluded that Plaintiff had no past relevant work.  AR 38.  At step five, in reliance on the VE's testimony, the ALJ concluded that Plaintiff could perform other jobs

existing in significant numbers in the national economy: electronics worker; printed circuit board pre-assembler; and cashier II.  AR 39.  The ALJ further found at step five that, even if Plaintiff were limited to sedentary exertional work, he could still perform jobs existing in significant numbers in the national economy: touchup screener, food and beverage order clerk.  AR 40.  Accordingly, the ALJ concluded Plaintiff was not disabled at any time since his application date of June 5, 2018.

### V.   Issues Presented

Plaintiff asserts two claims of error: 1) that the ALJ improperly discounted the medical opinions; and 2) that the ALJ erred by rejecting Plaintiff's statements.

### A.   Applicable Law

Before proceeding to step four, the ALJ must first determine the claimant's residual functional capacity.  *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018).  The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The RFC must consider all of the claimant's impairments, including those that are not severe.  20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

In doing so, the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995).  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment."  *Robbins,* 466 F.3d at 883.  *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence).  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings."  *Magallanes*

*v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

For applications filed on or after March 27, 2017, the new regulations eliminate a hierarchy of medical opinions, and provide that "[w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, when evaluating any medical opinion, the regulations provide that the ALJ will consider the factors of supportability, consistency, treatment relationship, specialization, and other factors. 20 C.F.R. § 404.1520c(c). Supportability and consistency are the two most important factors and the agency will articulate how the factors of supportability and consistency are considered. *Id.*

On April 22, 2022, the Ninth Circuit addressed whether the specific and legitimate reasoning standard is consistent with the revised regulations, stating as follows:

> The revised social security regulations are clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant. See 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) ..., including those from your medical sources."). Our requirement that ALJs provide "specific and legitimate reasons" for rejecting a treating or examining doctor's opinion, which stems from the special weight given to such opinions, see Murray, 722 F.2d at 501–02, is likewise incompatible with the revised regulations. Insisting that ALJs provide a more robust explanation when discrediting evidence from certain sources necessarily favors the evidence from those sources—contrary to the revised regulations.

*Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022)

### B.   Analysis

#### 1)   NP Wylie

Plaintiff's cardiology Nurse Practitioner Wylie (NP Wylie) opined in relevant part that Plaintiff was limited to 0-2 hours standing, walking, and sitting at one time, should not climb stairs or lift more than 15 pounds due to "sob" [shortness of breath], or lightheadedness, dizziness, or loss

of balance; never crouch or crawl; occasionally perform other postural activities.  AR 418–420.

In rejecting the opinion, the ALJ stated:

On September 6, 2017, Jonathan Wylie, NP opined that the claimant could stand/walk for 0-2 hours, sit 0-2 hours, and occasionally lift 10 pounds (Exhibit B3F). Mr. Wylie also gave some mental limitations based on his heart condition (Exhibit B4F). The undersigned finds Mr. Wylie's assessment unpersuasive. This provider is a NP in the claimant's cardiology clinic. This opinion does not take into account the significant improvement in heart functioning that the claimant experienced with treatment.

AR 37.

Plaintiff disputes the ALJ's emphasis on Mr. Wylie's status as an NP.  The Social Security Administration adopted new rules applicable to claims filed on or after March 27, 2017, which expanded the category of acceptable medical sources to include sources not previously included. 20 C.F.R. §§ 404.1502(a)(8) (2017); 416.902(a)(8) (2017); Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).

The expanded category includes "Licensed *Advanced Practice Registered Nurse* [APRN], or other licensed *advanced practice nurse with another title*, for impairments within his or her licensed scope of practice . . ." 20 C.F.R. § 404.1502(a)(7) (emphasis added).  Though not explicitly stated in the revised regulations, the expanded category does indeed include nurse practitioners because "All nurse practitioners *are* advanced practice registered nurses[3]" (as recognized by universities[4] and the American Association of Nurse Practitioners.).[5]

District courts in other circuits have noted that NPs are acceptable medical sources under the revised regulations.  *See, e.g.*, *Bridget K. v. Kijakazi*, 2023 WL 1262753, at *5 (S.D. Ill. Jan. 31, 2023) ("nurse practitioners are considered acceptable medical sources for claims filed on or

---

[3] Though not all APRNs are NPs.  https://www.pacific-college.edu/blog/np-vs-aprn
[4]                *See,                e.g.,*                https://www.gcu.edu/blog/nursing-health-care/comparing-aprn-vs-np-careers#:~:text=An%20APRN%20can%20choose%20from,specialize%20in%20a%20particular%20area.
[5] https://www.aanp.org/advocacy/advocacy-resource/position-statements/scope-of-practice-for-nurse-practitioners.

after March 27, 2017."); *Christopher T. M. v. Comm'r of Soc. Sec.*, 2023 WL 2332296, at *4 (W.D.N.Y. Mar. 2, 2023) ("both sources are nurse practitioners and therefore acceptable medical sources."); *Dawn Z v. Soc. Sec. Admin. Comm'r*, 2018 WL 5659912, at *3 & n.6 (D. Maine Oct. 31, 2018) (rejecting Defendant's argument that a "psychiatric mental health nurse practitioner ... was not an 'acceptable medical source" under Defendant's regulations, because "[t]he rules and regulations ... provide that advance nurse practitioners are acceptable medical sources for purposes of claims filed on or after [March 27, 2017]").

The ALJ appeared to suggest NPs are not acceptable medical sources, or found the NP status problematic for other reasons unexplained.

As to Plaintiff's alleged substantial improvement in his heart condition, that is essentially the crux of the ALJ's reasoning in support of the RFC, rejection of the examining medical opinions, and rejection of Plaintiff's testimony, all of which are addressed in more detail below.

### 2)   Dr. Venturina

Plaintiff's family practice physician, Dr. Venturina, opined that Plaintiff could stand and/or walk 0-2 hours (consecutively and total), sit for 2-4 hours (consecutively and total); had manipulative limitations; and had postural and environmental restrictions; could lift/carry 10 pounds maximum. AR 1878–79.

The ALJ rejected the opinion stating as follows:

> The undersigned finds Dr. Venturina's opinion unpersuasive given its lack of foundation in the objective medical evidence. His opinion is highly inconsistent with the objective medical evidence and other evidence of record. These opinions have been considered, but in view of the overall record, is found not to be persuasive and unsupported by the objective medical evidence. Additionally, the undersigned notes that this report is a checkbox form with no significant narrative explanation and he offered no citation to supporting record evidence. Treatment records shows only routine treatment with no objective evidence to support these limitations. Nevertheless, the undersigned acknowledges that the claimant has multiple conditions, which cause him pain and limitations. However, the above restrictions in the residual functional capacity fully accommodates the claimant's allegations and the RFC incorporates limitations for the impairments identified by Dr.

Venturina. Moreover, Dr. Venturina's opinion is not proportionate to the opinions from the medical doctors in this case (Exhibits B3A; B5A; B14F). However, as with all opinions rendered as to the claimant's "disability" or inability to work, this issue is clearly reserved for the Commissioner (20 CFR 404.1527(d) and 416.927(d)).

AR 38.

The ALJ first asserts the opinion lacks foundation in the objective evidence, which as addressed in more detail below is ultimately unavailing. The ALJ then repeats the same assertion a second and third time in succession which does not add persuasiveness or nuance.

The ALJ then notes the opinion was a check box form without significant narrative explanation or citations to the record. Further to the point, Defendant contends that "Such opinions require no further consideration pursuant to the regulations as they are conclusory with little substantive analysis and consist of little more than places to check yes or no." (emphasis added) (citing *Batson v. Comm'r*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("The ALJ discounted [the doctor's] view because it was in the form of a checklist, did not have supportive objective evidence, was contradicted by other statements and assessments of [the plaintiff's] medical condition, and was based on [the plaintiff's subjective descriptions of pain.").

Controlling precedent unambiguously provides that "an opinion cannot be rejected merely for being expressed as answers to a check-the-box questionnaire," though lack of supporting explanation and evidence can justify rejecting it. *Ford v. Saul*, 950 F.3d 1141, 1155 (9th Cir. 2020).

Check-box forms are the most common medium for treating sources to express their opinion. There would be very little case law applying the former "treating physician rule" if the treating physician's opinion could simply be disregarded if rendered in check-box form. No regulatory authority provides that check box opinions require no consideration. Indeed, Defendant cites no such regulation. Defendant does cite *Batson*, though the parenthetical quotation makes clear that it is the lack of supporting evidence driving the rule, not the check-box format.

Further, the agency itself maintains check-box RFC questionnaires (such as form HA-1151)

8

Medical Source Statement of Ability To Do Work Activities (Physical) provided to consultative examiners to express a functional opinion..[6]   That questionnaire is mostly identical in form and content to the California DHHS form completed by Dr. Venturina here.  Form HA-1151, much like the form here, contains minimal space for elaboration.   Dr. Venturina did provide narrative explanations in each section and importantly the ALJ was non-responsive to those explanations.  AR 1878.

Dr. Venturina opined that "patient cannot sit for extended periods at a time due to recent pulmonary embolism otherwise he will be at risk of worsening lung disease" and "patient must ambulate intermittently throughout the day to prevent worsening lung blood clots, however his heart failure makes it difficult to ambulate."  AR 1878.  It's not clear what the ALJ expected Dr. Venturina to reference as far as physical examinations.  The identified limitation is predicated on imaging tests revealing pulmonary embolism (blood clot in lungs) and Dr. Venturina's opinion that immobilization is an exacerbating factor.

The ALJ states "Dr. Venturina's opinion is not proportionate to the opinions from the *medical doctors in this case*."  AR 38 (emphasis added).  That assertion is not accurate. There were six medical opinions issued in this case: the two non-examining opinions provided by Drs. Mazuryk and Fast; the examining opinion of  CE Dr. Wagner; and, the treating source opinions of NP Wylie, Dr. Venturina, and Dr. Bass.

To say that a treating source's opinion is not proportionate to the non-examining opinions is a truism.   The latter opinions form the basis for the agency's initial and reconsideration determinations which necessarily resulted in a finding of non-disability, otherwise the case would

---

[6]  https://omb.report/omb/0960-0662 (SSA uses Forms HA-1151 and HA-1152 to collect data that is required to determine the residual functional capacity (RFC) . . .  respondents are medical sources paid by SSA to provide reports based either on existing medical evidence or on consultative examinations conducted for the purposes of the report).

not have proceeded to the ALJ hearing level.[7]

Dr. Venturina's opinion was not disproportionate to the other two treating sources opinions of NP Wylie and Dr. Bass.  Further, the ALJ overlooked that independent CE Dr. Wagner opined Plaintiff was limited to four hours of standing/walking "given the congestive heart failure and asthma."  AR 1678.  That was not as restrictive as Dr. Venturina's limitation of 0-2 hours, but still more limiting than the ALJ's RFC of 6 hours of standing and walking as required by light work.  The ALJ did not incorporate Dr. Wagner's opinion as to the four hour maximum daily stand/walk despite stating that his opinion was persuasive (seemingly without exception).

Finally, the ALJ notes that "as with all opinions rendered as to the claimant's "disability" or inability to work, this issue is clearly reserved for the Commissioner."  AR 38 (citing 20 CFR 404.1527(d) and 416.927(d)).  However, this point does little to further defendant's argument as it is a given in all cases and is not especially helpful in resolving the issue at hand.   Moreover, simply checking a box regarding a conclusion of disability does not undermine the remainder of the opinion.

### 3)   **Dr. Bass**

Dr. Bass, another family medicine treating source, completed the same form as Dr. Venturina but without completing the physical capacities attachment, opining only generally that Plaintiff could work a non-physical job 2-4 hours per day due to severe COPD and heart failure.

---

[7] Emphasis on those "medical opinions" as if they are novel pieces of evidence before the ALJ's consideration at the hearing level makes the ALJ's "de novo" review somewhat illusory.  They are owed no deference on de novo review by the ALJ. Thus, the Ninth Circuit explains that the opinion of a non-examining physician may constitute substantial evidence only when it is "consistent with independent clinical findings or other evidence in the record."  *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).   Notably absent from the *Thomas* decision is anything suggesting that state agency physician's status as "SSA disability program experts familiar with its evidentiary requirements," is a relevant consideration, despite the fact that this language is woven into the fabric of ALJ opinion-writing templates.  Those statements are also in tension with the concept of de novo review, as they have little meaning.  They merely suggest that the ALJ believes state agency reviewing physicians do their jobs well.  Here, the ALJ provided some unique commentary that reinforces that perception, such as "it should be noted that Dr. Mazuryk and Dr. Fast review the medical evidence objectively . . .," an unnecessary statement to make in the absence of any suggestion that the doctors were anything other than objective in their review.  AR 36-37.

AR 1687.  In discounting the opinion, the ALJ copied the same language quoted above that was used to discount Dr. Venturina's opinion.  Plaintiff acknowledges Dr. Bass's opinion is quite abbreviated.  It would likely not survive scrutiny standing alone.  But, given the presence of two other more detailed treating source opinions in the record (NP Wylie and Dr. Venturina), Dr. Bass's opinion does marginally add support for the proposition that Plaintiff's cardiac and pulmonary conditions do limit his exertional capacity below the level required for light work (as also opined by the CE Dr. Wagner).

### 4)      The NYHA Classifications

Plaintiff also contends the ALJ erred in failing to weigh the medical "opinion" inherent in the NYHA Class III classification for heart failure referenced throughout the record (AR 1524, 1534, 1579, 1590, 1640, 1652).  According to the American Heart Association, NYHA Class III denotes "Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, shortness of breath or chest pain."[8]

Plaintiff relies on *Reed* for the proposition that "NYHA assessments within treatment notes are medical opinions."  Br. at 15 (citing *Reed v. Berryhill*, 337 F.Supp.3d 525, 527-528 (E.D. Pa. Oct. 9, 2018).  In so concluding, the *Reed* court applied the regulation applicable to claims filed before March 27, 2017, which defined "medical opinion" as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527.

Here, the revised regulation defines medical opinions as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more

---

[8] Classes of Heart Failure, AM. HEART ASS'N, http://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure (last visited 9/13/2023),

impairment-related limitations or restrictions in the abilities listed in paragraphs (a)(2)(i)(A) through (D) and (a)(2)(ii)(A) through (F) of this section." 20 C.F.R. § 416.913. The subsections referenced in the definition then list the common work functions including sit, stand, walk, push, pull, lift, carry. *Id.* The revised regulation does not include the language from the previous version which included "judgments about the nature and severity of your impairment." The NYHA classification is perhaps a bit more generalized than would meet the strict definition of "medical opinion" in that it does not address the claimant's ability to perform specific work functions. On the other hand, if less than ordinary activity causes heart palpitations, the reasonable implication is that essentially all work activity is precluded.

In any case, there is ample opinion evidence here that addresses functional capacities with more specificity than the NYHA classification, such that remand is independently warranted without consideration of the NYHA classification. As such, the Court need not determine whether an ALJ errs in neglecting to discuss NYHA classifications as medical opinions.

### 5)    Broader Reasoning in Support of the RFC

A reviewing court is not "deprived of [its] faculties for drawing inferences from the ALJ's opinion," provided "those inferences are there to be drawn." *See Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989). Nevertheless, a reviewing court must take care to stay within the bounds of the reasoning the ALJ asserts, and not engage in post-hoc rationalization that attempts to intuit what the ALJ was thinking. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219 (9th Cir. 2009). Although toeing that line is a delicate task, no controlling authority limits a court to the language that follows "I reject Dr. Smith's opinion because . . ."

Here, prior to addressing the opinion evidence, the ALJ provided 7 pages of discussion, after which the ALJ provided the following discussion tying the reasoning together:

> Overall, the longitudinal evidence of record does not support the claimant's allegations

12

. . .

The medical evidence of record demonstrates that the claimant has congestive heart failure, hypertensive vascular disease, asthma, obesity, and history of pulmonary embolism. However, the objective medical evidence of record demonstrates that the claimant's impairments are  neither as debilitating nor disabling as alleged and that he has received routine and conservative treatment for his impairments with largely normal physical examinations.

The medical evidence of record demonstrates that the claimant has systolic heart failure. A December 1, 2016 echocardiography showed an ejection fraction of 30-35% (Exhibit B5F/136). His cardiology providers concluded that his heart failure was most likely due to a history of heavy alcohol use. The claimant continued to drink against the advice of his cardiologist, but he reportedly reduced and eventually stopped his alcohol use. His heart failure was treated with several medications. Echocardiography in October 2018 showed significant improvement in his heart functioning, with an ejection fraction of 55% (Exhibit B10F/7). May 2019 myocardial perfusion test showed ejection fraction of 68% (Exhibit B17F/67). The claimant has obstructive and restrictive lung disease. Pulmonary function testing in November 2018 showed listing-level obstructive disease (Exhibit B17F/90), but this study was done only about 2 weeks after he was hospitalized for pulmonary emboli. There are no other pulmonary function tests in the record to evaluate his baseline lung functioning. July 2019 chest CT angiogram was negative for acute PE and showed emphysema (Exhibit B17F/69).

In addition, the claimant's allegations are not fully consistent with his noncompliance with treatment. For instance, the records indicate variously that the claimant has been without medications for some time; he was not taking his medications regularly; he has not been taking his medications; and he also reported that he has not been watching his diet and consuming a lot of salt (Exhibits B5F/13; B6F/5; B10F/42-55). He also reported that he uses drugs, including Marijuana, about 7 times per week (Exhibit B5F/6).

Physical examinations in the medical records show some limitations, but do not support that the claimant would have limitations greater than those given in the residual functional capacity in the section heading. There is no evidence of lower or upper extremity weakness or neurological abnormality. Physical examination findings revealed he had 5/5 motor strength in the bilateral upper and lower extremities (Exhibits B11F/7; B14F/5). Furthermore, the evidence demonstrates that the claimant used no assistive devices for ambulation, such as a cane or walker, and none was prescribed. Physical examination findings revealed the claimant had a normal gait and used no assistive device for ambulation (Exhibit B14F/4).

AR 34–35.

### a.    Objective Medical Evidence

As for objective evidence, throughout the decision the ALJ recited progress notes consistently reflecting all or some combination of the following: lungs clear to auscultation bilaterally with no acute respiratory distress; no wheezes, rales, or rhonchi; regular heart rate and rhythm; normal S1 and S2; no murmur, rubs, clicks, gallops, heaves, or jugular veinous distension. AR 28–34.  These findings are perhaps suggestive of reasonably well controlled cardiac/pulmonary conditions, though ultimately not sufficient enough to support the RFC given diagnostic findings and opinion evidence discussed in more detail below.

The ALJ then explains that the physical examinations in the record do not support a more restrictive RFC than the ALJ formulated because there was no evidence of weakness or neurological abnormality, he had 5/5 motor strength in the bilateral upper and lower extremities, used no assistive devices for ambulation, and had a normal gait.  This oft used language is perhaps better suited for a typical case involving common degenerative/osteoarthritic conditions of the lumbar spine, cervical spine, knee, hip, or other joint.   In those cases, the relevance of musculoskeletal examination findings is usual self-explanatory.  Here there was a history of back injury and related testimony as well as leg swelling, but no medical evidence supporting a medically determinable impairment.  Counsel did not contend otherwise at the hearing or on appeal, and indeed the ALJ found no such musculoskeletal or neurological impairments.

There is no reason to believe that Plaintiff's cardiovascular and pulmonary conditions would manifest with any focal weakness, neurological abnormality, gait abnormality, or loss of range on or about any specific joint or muscle group.  Rather, the implication from the examining sources as discussed extensively above is that the exertional limitations were secondary to shortness of breath, fatigue, dyspnea on exertion.  The normal musculoskeletal and neurological examination findings cited by the ALJ do not undermine those opinions.

Defendant emphasizes the improved ejection fraction figures from 30% to 68% from 2016

14

to 2019.   Nevertheless, all four examining sources (including the CE, Dr. Wagner) concluded Plaintiff could not stand/walk to the extent required for light work.

The ALJ noted pulmonary function testing in November 2018 showed near listing-level obstructive disease (Exhibit B17F/90).   Although Plaintiff did not meet the presumptively disabling Listings (which are notoriously difficult to meet), it does not follow that he could meet the demands of light or sedentary work. Importantly, all three treating sources opined he could not sit for 6 hours per day.[9]  Dr. Venturina in particular explained that extended sitting was a risk factor for worsening pulmonary emboli, despite the ALJ's assertion that the doctor did not explain or support his opinion.

The ALJ further noted a July 2019 chest CT angiogram was negative for acute PE and showed emphysema (Exhibit B17F/69).   AR 1854.   That was not the full diagnostic impression. As noted in the summary of medical evidence earlier in the decision, the angiogram also showed "cardiomegaly, evidence of possible atrial septal defect, and marked emphysema changes." (AR 33).   But in the paragraphs subsequently tying the reasoning together and summarizing what the longitudinal record showed (as quoted above), the ALJ appeared to select predominately the benign findings as exemplary.  AR 34.

Although an ALJ is certainly not categorically barred from independent review and translation of medical evidence,[10] all findings (both positive and negative) should be referenced

---

[9] Social Security Ruling 83-10 provides that "at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and /sitting should generally total approximately 6 hours of an 8-hour workday."  The Ninth Circuit has thus noted (as has this Court) that i]n a work environment requiring sedentary work, the Social Security Rules require necessary sitting as the ability to do such for six to eight hours a day."  Vertigan v. Halter, 260 F.3d 1044, 1052 (9th Cir. 2001); see also Tackett v. Apfel, 180 F.3d 1094, 1103 (9th Cir. 1999) ("to be physically able to work the full range of sedentary jobs, the worker must be able to sit through most or all of an eight hour day."); Aukland v. Massanari, 257 F.3d 1033, 1036 (9th Cir. 2001) (same); Canady v. Comm'r of Soc. Sec., 2023 WL 3931797, at *4 (E.D. Cal. June 9, 2023) (same).
[10] This task in general is consistent with the ALJ' role as characterized by the Ninth Circuit.  *See Rounds v. Commissioner of Social Security Administration*, 807 F.3d 996, 1006 (9th Cir. 2015) ("[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC.").

when doing so.  Further, the imaging findings here are not the common, user-friendly findings of disc degeneration or arthritic changes that come pre-labelled by the radiologist as mild, moderate or severe.  The abnormalities noted on the CT angiogram here have little meaning to a layperson.  The ALJ steps outside the ALJ's role by elevating her interpretation thereof above all three treating sources (as to sitting, standing and walking) and over the CE (as to standing and walking).

### b.   Treatment Non-compliance

#### i.   Life Vest

The ALJ also noted on four different occasions progress notes reflecting that Plaintiff did not wear his life vest despite advice that he do so because it is a life-saving device.[11]  AR 28 ("no longer wished to wear his life vest, as it did not fit him correctly."); 29 ("He has not been wearing his life vest for the past 1 month. The claimant was advised that it is a life saving device, and he was encouraged to wear this."); 31 ("The claimant received a Life Vest, but he stopped using it due to discomfort,"); 32 ("Dr. Bass noted that the claimant was given a life vest, but does not wear it."). The purpose of this commentary is unclear.  It is not tantamount to a failure to follow a "treatment" instruction as it provides no ongoing therapeutic/treatment benefit; it is fail-safe in the event of a worst-case scenario.

#### ii.   Substance Use

The ALJ also extensively discussed findings related to alcohol and marijuana use.  AR 28 (1 case daily as of March 10, 2017;  smoking history but quit 1 month ago); AR 28 (6 beers daily by March 15, 2017); AR 29 (2 beers daily by April 7, 2017); AR 29 (back to 6 daily by May 2017); AR 29 (2-3 by June 2017); AR 29 (stopped drinking by July 7, 2017; back to 2 daily by July 31, 2017); AR 30 (unspecified number every other day by November 2017); AR 30 (unspecified

---

[11] A LifeVest is a wearable automatic defibrillator for individuals at risk for sudden cardiac arrest, designed to be worn at all times and removed only for bathing.  https://my.clevelandclinic.org/health/treatments/17173-lifevest

quantity as of April 2018); AR 30 (drinking 24-36 ounces of alcohol per week, "using drugs, including marijuana, about 7 times per week"); AR 31 (1-2 beers 1-2x a week as of August 2018); AR 31-32 (3 beers every other day by October 2018).  The ALJ subsequently noted that Plaintiff "The claimant continued to drink against the advice of his cardiologist, but he reportedly reduced and eventually stopped his alcohol use."  AR 35.

The ALJ cites no evidence indicating Plaintiff was advised to completely abstain from alcohol use.  Rather, the record is replete with pamphlets reflecting the same 2 drink maximum for men, and 1 drink for women which the CDC recommends for the general population.  AR 402, 412, 682, 1540, 1597 1658, 1724, 1742, 1759, 1783.  It appears Plaintiff more or less stayed within that guideline during the relevant period before abstaining altogether.

Even assuming the cardiologist advised complete avoidance, treating that as tantamount to an unexplained failure to follow treatment recommendations is not altogether persuasive.  Alcohol use is a risk factor for virtually every disease and illness, and it would probably be rare for a  doctor not to advise against use.  And, as the ALJ noted, Plaintiff reduced and eventually stopped his alcohol use, as he did with his cigarette smoking.   As to Plaintiff "using drugs, including marijuana," the purpose of the commentary is unclear.  No other drug is identified, and it doesn't indicate that he was smoking the marijuana (an obvious risk factor for pulmonary impairments).

Further, substance abuse and alcoholism is specifically addressed in the regulations at 20 C.F.R. 416.935, which disallows an award of benefits where: a) the ALJ finds drug addiction or alcoholism, and, b) the substance abuse is a contributing factor material to the determination of disability.  The ALJ did not make those findings either overtly or by reasonable implication, nor did the ALJ reference that regulation.

The ALJ also stated that Plaintiff's "cardiology providers concluded that his heart failure was most likely due to a history of heavy alcohol use."  AR 34.  That is an overstatement.   The

cited record states "NYHA Class III: uncertain etiology. suspect alcohol is associated though the patient has multiple risk factors for ischemic heart disease." Ex. B5F/136, AR 556.

### iii.  <u>Medication Non-Compliance</u>

The ALJ cites Exhibit BF5/13 which notes "Patient has been without some [of] his medications for some time . . ." AR 433. "Some medications for some time" does not specify which medications or for what period of time. "Has been without" does not necessarily suggest non-compliance. The same progress notes suggest he simply was not in physical possession of all of his medications (upwards of 13) at all times during a period where he was facing impending eviction and homelessness. *See, e.g.,* AR 430 ("patient does not have his Potassium Chloride, Loratidine, or Eplorenone, on today's visit. He has all of his other medication"); AR 432 (in need of income assistance, facing eviction, "essentially homeless.").

The ALJ also cited Exhibit B6F/5 for the proposition that Plaintiff was "not taking his medications regularly" though the ALJ omits the remainder of the sentence in the progress note, namely "as he doesn't always have his medications with him." AR 631. The same paragraph of the progress note indicates he'd been evicted, could not use his vehicle as he could not afford to renew the plates, was not able to secure section 8 housing for him and his daughter, and was staying with a friend until he overstayed his welcome. *Id.*

The ALJ cited Exhibit B10F/42-55 for the same propositions. AR 772–85. The first cited page notes "Pt states ran out of medication 2 days ago." AR 772. Similarly, the progress note on the second cite notes "Patient mentions that he recently ran out of his medications. Has been unable to get them refilled." AR 773. This is repeated multiple times throughout the 13 cited pages. The commentary about his medications does not support an inference of treatment non-compliance.

### iv.  <u>Sodium Consumption; Not watching diet</u>

The ALJ also noted that Plaintiff admitted "he has not been watching his diet and consuming

18

a lot of salt".  AR 433.  Although it is perhaps common knowledge that excessive sodium intake is associated with cardiovascular disease, there is no indication that he was on a unique salt restricted diet.  Rather, the record contains generic recommendations appended to his chart regarding limiting salt to 2g per day, essentially the same recommendation applicable to the general population (2,300mg).[12]  His non-specific admission to his provider that he was eating "a lot" of salt may or may not have actually exceeded that threshold.

Further, with regard to Plaintiff not watching his diet, there does not appear to be specific dietary recommendations other than general pamphlets for heart failure patients:

> Eat heart-healthy foods and limit sodium (salt). An easy way to do this is to eat more *fresh fruits and vegetables* and fewer canned and processed foods. Replace butter and margarine with *heart-healthy oils* such as olive oil and canola oil. Other heart-healthy foods include walnuts, whole-grain breads, low-fat dairy products, beans, and lean meats. *Fatty fish such as salmon and tuna* are also heart healthy. Ask how much salt you can eat each day. Do not use salt substitutes.

AR 1784 (emphasis added).  These recommendations are a bit out of touch with the realities faced by low income individuals like Plaintiff who was at times homeless, staying at friends' homes with his 8-year old daughter, without transportation, and without income save for Calfresh food stamps.  AR 810.  His non-specific admission that he was not "watching his diet" and consuming "a lot" of salt is not tantamount to a failure to follow treatment instructions.

### c.   Daily Activities[13]

---

[12]     *See*                    https://www.fda.gov/food/nutrition-education-resources-materials/sodium-your-diet#:~:text=However%2C%20the%20Dietary%20Guidelines%20for,recommended%20limits%20are%20even%20lower.

[13]. A claimant's statements of pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability.  42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p.  An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  See Garrison v. Colvin, 759 F.3d 995, 1014 (9th Cir. 2014); Smolen, 80 F.3d at 1281; S.S.R 16-3p at 3.  First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged.  Garrison, 759 F.3d at 1014; Smolen, 80 F.3d at 1281–82.  If the claimant satisfies the first step and there is no evidence of malingering, the ALJ must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities."  S.S.R. 16-3p at 2.  An ALJ's evaluation of a claimant's testimony must be supported by specific, clear and convincing reasons.  Burrell v. Colvin, 775 F.3d 1133, 1136 (9th Cir. 2014); see also S.S.R. 16-3p at *10.  Subjective testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence," but the medical evidence "is still a relevant factor in determining the severity of claimant's pain and its disabling effects."  Rollins v. Massanari,

19

1

2      The parties address this issue within the context of Plaintiff's second claim of error

3   regarding the ALJ's improper rejection of Plaintiff's "subjective statements," the rejection of which

4   is subject to a higher standard of review (clear and convincing reasons)[14] than applies to the ALJs

5   analysis of other categories of evidence.   Plaintiff testified to the same matters at issue regarding

6   the medical opinions and the RFC generally, namely his very limited inability to stand and walk

7   (one block according to Plaintiff) and limited ability to sit (less than 30 consecutive minutes

8   according to Plaintiff) due to his heart and lung conditions.   The ALJ's discussion below of

9
10   Plaintiff's activities of daily living (ADLs) is not persuasive under any standard of review:

11          Despite the claimant's limitations, he has shown an ability to engage in many
12          activities of daily living

13          . . .

14          In September 2017, the claimant reported that he has begun working odd jobs, and
            he has been lifting 35-50 pound printers and disposing of them in the trash (Exhibit
15          B5F/66). In October 2017, the claimant was working, and stated that his employer
            was having him do regular jobs by lifting more than 90 pounds and carrying a bucket
16          with water and chicken (Exhibit B5F/48). In January 2018, he was in Louisiana
17          visiting family (Exhibit B7F/7, 10). In April 2018, the claimant reported that he
            takes care of his 8-year-old daughter and that he was trying to secure housing for
18          both him and his daughter, and his girlfriend (Exhibit B5F/12-13). In October 2018,
            the claimant recently took an 8-10 hour road trip from Richmond, CA to San Diego
19          (Exhibit B10F/16-17). In September 2019, the claimant reported that he currently
20          lives with his girlfriend and his 10-year-old daughter. He cooks and cleans. He only
            occasionally drives. He shops and performs his own activities of daily living without
21          assistance and walks some for exercise. (Exhibit B14F/2).

22          AR 35.   As for the odd jobs from September 2017 during which Plaintiff was lifting 35-50

23   pound printers and disposing of them in the trash (AR 35), the ALJ's earlier factual summary

24   contained contextual information omitted from the ALJ's later discussion: "As of September 11,

25

26
     _____
27   261 F.3d 853, 857 (9th Cir. 2001); S.S.R. 16-3p (citing 20 C.F.R. § 404.1529(c)(2)).
     [14] Described as "the most demanding standard required in Social Security cases", *Moore v. Commissioner of SSA*,
28   278 F.3d 920, 924 (9th Cir. 2002).

2017, the claimant reported that he has begun working odd jobs, and he has been lifting 35-50 pound printers and disposing of them in the trash (Exhibit B5F/66). *This caused shortness of breath and near-syncope, but this resolved after he quit this job*." AR 29 (emphasis added). This suggests 35-50 pound printer trash disposal caused some of the very symptoms he contends are disabling, which does not support the notion that he could indeed perform such an activity consistently, nor does it contradict his testimony as to the severity of symptoms.[15]

As to lifting of 90 pound chicken buckets, the ALJ cites a brief discussion from a progress note indicating "Pt expressed that he is stressing because his disability stopped and he is going to appeal it. Pt stated his employer is having him do regular job by lifting more than 90 pound and carrying a bucket with water and chicken…MSW advised Pt to take forms to his PCP." AR 468.

This brief discussion suggests plaintiff was perhaps concerned about his ability to perform the required lifting activity at Foster Farms and sought a disability certification from his PCP. The discussion provides no context as to whether he was indeed able to successfully lift the 90 lb chicken buckets at Foster Farms, nor with what frequency, or for what duration. Further, one need only perform a CTRL find for the word "farm" in the record to find additional pertinent information the ALJ omitted: 1) progress notes indicating the chicken buckets weighing 35-60 lbs,[16] as opposed to 90 lbs, 2) "Patient reports significant shortness of breath and near syncope when lifting heavy items," (AR 470) and 3) the work at Foster Farms lasted only about one week. (AR 336). This does not suggest he could continue lifting, 35, 60, or 90 pound buckets on an ongoing basis.

As to Plaintiffs trip to Louisiana to visit family, there is no indication what he did there, what mode of transportation he used, or whether his intolerance for extended sitting, standing and

---

[15] *See Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (explaining that An ALJ can rely on a claimant's daily activities as a basis for discrediting a claimant's testimony if (1) the daily activities contradict the claimant's other testimony; or (2) "a claimant is able to spend a substantial part of [her] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting."

[16] This would still vastly exceed the lifting requirements of light work; thus the weight discrepancy is far from outcome determinative.

walking was accommodated.  AR 648, 651.

As to "trying to secure housing for both him and his daughter" while facing eviction and expiration of his section 8 housing voucher (AR 432–33), no further discussion is necessary.

As to the 8-hour road trip to San Diego, the record does reflect he "remained in his [car] during the whole time. Reports that he ambulates most of the time, but lately hasn't been."  AR 746.  At first glance, this appears to undermine Plaintiff's testimony that he cannot sit for more than 30 minutes, and his treating sources' opinions to similar effect.  But the 8-hour road trip resulted in an Emergency Department visit at which "Chest CT showed multiple bilateral small pulmonary emboli" (AR 31, citing Ex. B10F/5, 21 (AR 735, 751).  The same records also reflect that the pulmonary embolism "etiology [is] likely secondary to venous stasis given patient reports being immobile." AR 735.  Approximately 1-week later, on November 6, 2018, Dr. Venturina completed the RFC questionnaire opining Plaintiff can sit 0-2 hours consecutively, and 2-4 hours in an 8-hour day due to pulmonary embolism.  AR 1878.  Thus, the road trip to San Diego does not undermine the sitting limitation; in fact, the road trip was the very inciting event giving rise to the sitting limitation.

Finally, the ALJ notes that "He cooks and cleans. He only occasionally drives. He shops and performs his own activities of daily living without assistance and walks some for exercise." AR 35 (citing Exhibit B14F/2 (AR 1675)).  In support the ALJ cites a four-line summary of Plaintiff's ADLs as reported to the CE Dr. Wagner, lacking in context and detail about the frequency, nature, and extent of these activities as compared to Plaintiff's oral testimony or a function report.  This would be a rather thin basis upon when to base a conclusion about Plaintiff's activity level given the inadequacy of the ALJ's remaining discussion.

## VI.    Conclusion

The ALJ's decision was supported to some extent by improved ejection fraction

percentages, and physical examinations routinely showing lack of wheezes, rales, rhonchi, or related abnormality.  But this was insufficiently substantial evidence given: 1) continued cardiac and pulmonary anomalies including, a) October 2018 pulmonary embolism, b) November 2018 pulmonary function tests showing obstructive disease of listing level severity but for the close temporal proximity to acute pulmonary embolism and the lack of baseline lung function testing against which to compare the changes, and c) July 2019 CT angiogram showing cardiomegaly, "increased opacification of the left cardiac chambers compared to the pulmonary artery" suggestive of possible atrial septal defect, and marked emphysema changes; 2) examining opinions from all three treating sources and the independent CE that Plaintiff could not perform the standing and walking requirements of light work and Plaintiff's testimony to the same effect; and 3) the three treating source opinions that he could not sit to the extent required by sedentary work (and Plaintiff's testimony to the same effect), which Dr. Venturina explained was due to pulmonary embolism, risk of worsening lung disease, and need for periodic ambulation to avoid clotting.

## VII.   **Recommendations**

For the reasons stated above, the undersigned recommends that the Court find that substantial evidence and applicable law do **not** support the ALJ's conclusion that Plaintiff was not disabled.  The undersigned further recommends that Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be **granted**, and that this action be remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with these Findings and Recommendations.   *See Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("Generally when a court . . . reverses an administrative determination, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

The undersigned further recommends that the Clerk of Court be directed to enter judgment in favor of Plaintiff Darren Dwight Haggerty and against Defendant Kilolo Kijakazi, acting

Commissioner of Social Security.

### VIII.   Objections Due within 14 Days

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within fourteen (14) days after being served with these Findings and Recommendations, any party may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   __September 26, 2023__                    _____/s/ Gary S. Austin__
                                               UNITED STATES MAGISTRATE JUDGE